IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BENOIT ROLLAND,<br><br>    Plaintiff,<br><br>vs.<br><br>PETER PRIER & SONS VIOLINS, INC., SPICCATO FRENCH AMERICAN BOWS, INC., PETER PAUL PRIER, PAUL STEWART PRIER, and JON HATCH,<br><br>    Defendants. | DECLARATION OF<br>PAUL STEWART PRIER<br><br><br><br>Civil No. 04CV11491 RWZ |

I, Paul Stewart Prier, declare as follows:

1.  I am a citizen of the United Sates of American residing in the State of Utah and have been such at all relevant times in the above-identified matter.

2.  I am over the age of 21 and competent to testify. I have personal knowledge of the matters set forth herein.

3.  I am a son of Peter Paul Prier and the brother-in-law of Jon Hatch.

4.  Peter Paul Prier, Inc. (PPPI) was formed as a Utah corporation on July 21, 1977 and has at all times remained a Utah corporation. At all times relevant, I have been a Vice-President of PPPI. My father has operated PPPI on a day-to-day basis. PPPI has always operated in Salt Lake City, Utah. See attached Exhibit "A", a true copy of the Articles of Incorporation of PPPI, filed with the State of Utah.

1

5. The name of the corporation was changed on October 18, 1999 from PPPI to Peter Prier & Sons, Inc. (PPS). See attached Exhibit "B", a true copy of the Articles of Amendment filed with the State of Utah. The name was changed to reflect the fact that sons of my father joined him in this business.

6. PPPI/PPS has always been a closely held family corporation.

7. PPPI/PPS was created and operated for the purpose of making violins and teaching others to make violins. The name "Violin Making School of America" has been used, as a dba under auspice of PPPI/PPS, to identify the school for teaching the art of making violins.

8. At no time has PPPI/PPS ever been in partnership with any other business organization or person, including but not limited to Benoit Rolland.

9. I became aware of Mr. Rolland and his French company, SARL Benoit Rolland (SBR), aka La Sociéte Benoit Rolland, in about 1992.

10. I was trained in France in 1993 by Mr. Rolland in the art of making traditional bows from wood for use in playing string musical instruments.

11. Mr. Rolland had devised a bow, called the Spiccato, for playing musical instruments, made of synthetic material, which was less expensive than traditional wooden bows.

12. PPPI purchased, at wholesale, a number of Spiccato Bows from Mr. Rolland and resold these bows.

13. Later, PPPI invested $40,000.00 in SBR and became a shareholder (owner) of an undivided thirteen percent (13%). See Exhibits "C" and "D", true copies of documents prepared by Mr. Rolland.

14. Later, when other investors or prospective investors withdr interest in SBR rose to about 45%. See Exhibit "E." As can be seen from Exhibit typically calls investors and shareholders "partners."

15. The trademark SPICCATO was owned by SBR, not Mr. Rolland, and was regis in France and Benelux. See Exhibits "F", "G" and "H."

16. Later, when Mr. Rolland continued to have major financial problems, he closed his bow-making shop in France and discontinued activity in SBR.

17. SBR's ownership of the mark SPICCATO was never transferred. Certainly as a forty-five percent (45%) owner of SBR, PPPI/BPS never consented to any such transfer. So, in the alternative: (a) SBR still owns the mark SPICCATO in Europe in an inactive state; or (b) SBR, which has not used the mark in its own right on bows since October 1999, has abandoned, due to non-use, any rights SBR once had in the mark SPICCATO. If shareholders of SBR (Mr. Rolland and PPPI/PPS) somehow obtained rights in the mark SPICCATO when activity in SBR discontinued, the mark was appropriated and owned by PPPI/PPS as the only shareholder of SBR which used the mark SPICCATO after SBR abandoned its use. Mr. Rolland did not, thereafter, personally appropriate and use the mark SPICCATO.

18. On September 27, 2000, Mr. Rolland relinquished to Spiccato French American Bows, Inc. (SFAB), in Salt Lake City, any claim he may have had to the mark SPICCATO and quit claimed to SFAB the right to register the mark SPICCATO as owner. See Exhibit "I", which, at Paragraph 5 states:

3

> The brand SPICCATO was registered only in France. Then you can register it in the US and the main countries when you want. In any case this brand must be registered by the Company French American Bows, Inc.

19. Accordingly, SFAB filed a U.S. Trademark Application on SPICCATO for registration of SPICCATO, which was approved by the U.S. Trademark Office, but challenged in an opposition proceeding by non-user Mr. Rolland, but not by SBR.

20. When Mr. Rolland relocated from France to Salt Lake City, Utah, he was not a partner in anything, but made available to SFAB whatever intellectual property he may have owned. Mr. Rolland was separately employed on a W4 basis by both PPPS and SFAB. SFAB is and has always been a Utah corporation at all times operating in Salt Lake City, Utah. It is a closely held family corporation. A true copy of the Articles of Incorporation of SFAB is attached hereto as Exhibit "J." Copies of W4s signed by Mr. Rolland, confirming his employment by (not in partnership with) PPS and SFAB, are attached as Exhibit "K" and "L." Exhibit "M" is a copy of a payroll check from SFAB to Mr. Rolland and proof that Mr. Rolland negotiated the payroll check.

21. I am one of two officers of SFAB involved in the day-to-day operation of SFAB. I and Jon Hatch devote full time to the operation of SFAB.

22. I have never personally transacted any business of any type in the State of Massachusetts.

23. PPPI/PPS has not transacted any business of any type in the State of Massachusetts including but not limited to the sale of musical bows and violins, with one exception mentioned hereinafter.

24. While Mr. Rolland alleges an at will partnership in his Complaint, he knows that to be untrue. For this alleged phantom partnership there is and has been:

    a. no organizational activities, including but not limited to written organizational documents;

    b. no sales;

    c. no employees, agents or representatives;

    d. no tax identification number;

    e. no employee, agent, consultant or representative;

    f. no bank accounts;

    g. no receivable or payable invoice;

    h. no payment of any type;

    i. no income of any type;

    j. no literature or advertising material of any type;

    k. no real estate ownership or lease;

    l. no personal property ownership or lease;

    m. no vehicle ownership or lease;

    n. no tax returns;

    o. no telephone number;

    p. no facsimile number;

    q. no email address; and

    r. no domain name registration.

25. Had a partnership been formed with Mr. Rolland, it would have been formed in writing, in the same way more or less as SFAB was formed.

26. Based upon the representations of Mr. Rolland and the making available to first PPPI/PBS and later to SFAB his intellectual property, something on the order of one half million dollars has been expended in the formation and operation of SFAB, with the cooperation, active long term assistance of and non-owner participation by Mr. Rolland for the sole purpose of making synthetic musical bows. Such a large investment would not have been made in an oral at-will partnership nor in the absence of the clear availability of Mr. Rolland's intellectual property. Mr. Rolland declined an invitation to be a part owner (shareholder) of SFAB.

27. The synthetic bow business done in Salt Lake City after about December 4, 1997, when SFAB was formed, has been done by SFAB, and not by PPPI/PPS. All synthetic bow manufacturing and sales since about December, 1997 in Salt Lake City have taken place exclusively under the auspices of SFAB.

28. There has never been a question that Mr. Rolland made his intellectual property available to PPPI/PPS and SFAB. However, the nature and amount of compensation to be paid to Mr. Rolland has been orally negotiated and re-negotiated repeatedly by Mr. Rolland.

29. The large investment in SFAB, mentioned above would not have been made if Mr. Rolland had not made his synthetic bow intellectual property available without restriction and for the life thereof.

30. For the sum of $54,333.00 paid to SBR, PPPI/PPS and SFAB obtained the clients of SBR for synthetic (carbon fiber) bows, for use in Salt Lake City, about the time SBR discontinued

business and Mr. Rolland moved to Salt Lake City. See Exhibit "N." Obviously, the rights to make and sell synthetic bows to these clients was part of the transaction because the customers alone, with no right to sell, would have no value. It was the right to sell to the former clients of SBR which had value, justifying the $54,333.00 payment.

31.    The $3,000.00 mentioned in Exhibit "N" for technical support makes it clear that SFAB obtained a transfer of the synthetic bow technology and the right to use the technology, including all know how. Furthermore, the several documents comprising Exhibit "O" show transfer of tooling, equipment, technology and know how to PPPI/PPS and SFAB.

32.    As to use of "B. Rolland" and "Benoit Rolland" on synthetic bow and literature for the synthetic bows, it was always the desire of all parties involved to provide high quality bows and sell the maximum number possible. While it had been expected otherwise, no one in both the manufacture and marketing of SPICCATO bows has made a profit from about 1991 to the present time. It has been far more difficult to obtain commercial success than originally expected.

33.    Because Mr. Rolland is known in the art of bow making, there came a time when Mr. Rolland decided his name should be on all SPICCATO bows and on advertising concerning SPICCATO bows. See Exhibit "P."

34.    Until the Complaint in this litigation, there never was a notice challenging the right of SFAB to use the marks "SPICCATO", "B. Rolland" and "Benoit Rolland", because such was believed to enhance sales, helping SFAB to become profitable and inuring to Mr. Rolland's claim of royalties.

35. The initial and continuing usage of the marks SPICCATO, B. Rolland and Benoit Rolland on the synthetic bows and on related literature, was at Mr. Rolland's insistence. Exhibit "Q" shows such usage.

36. Mr. Rolland so insisted that both his name and the mark SPICCATO be on each synthetic bow that he sent to PPPI/BPS a template by which these names are and have been engraved onto each bow.

37. At one time, Mr. Rolland negotiated for, but did not receive return of an exclusive right to use his name. See Exhibit "R."

38. Effective on the date SFAB was formed (December 4, 1997), PPS assigned to SFAB all of its rights concerning the synthetic bow, Mr. Rolland and SPICCATO. See Exhibit "S." At about that time or shortly thereafter, all synthetic bow manufacturing and marketing in Salt Lake City has been done by SFAB, to the exclusion of PPPI/PPS.

39. The only sale made by PPPI into Massachusetts was of a SPICCATO bow made in France by Mr. Rolland in 1994, which is not at issue in the above-identified litigation. See Exhibit "T."

40. Originally, it was expected that Mr. Rolland would be a major shareholder in SFAB.

41. Mr. Rolland was invited to be a part owner of SFAB, but declined at least in part because he did not want his wife, from whom he was being divorced, to lay claim to some part of SFAB.

42. Before Mr. Rolland came to Salt Lake City, to help set up the operation of SFAB and teach at the newly created bow making school operated by PPS, Mr. Rolland resided in France,

8

where he made traditional bows and synthetic bows of the type at issue in the above-identified litigation.

43.     While Mr. Rolland was in France, there was no partnership nor was there a partnership involving Mr. Rolland and the Defendants or any of them at any time after he left France. When Mr. Rolland was in France, there were arms length wholesale purchases of synthetic bows by PPPI/PPS for Mr. Rolland.

44.     In 1996 and 1997, Mr. Rolland wanted to close his shop in France and agreed to help establish a shop in Salt Lake City for making synthetic bows. With Mr. Rolland's help, building the Salt Lake City shop started in 1997. In June 1997, Mr. Rolland visited and approved the shop in Salt Lake City and informed his vendors of the transfer of manufacturing to Salt Lake City. The shop in Salt Lake City was finished about mid-July 1997, with Jon Hatch and me being trained by Mr. Rolland in making synthetic bows.

45.     Mr. Rolland promised he would sign a contract, but never did, constantly endeavoring to renegotiate terms which earlier were orally said to be acceptable. When the Salt Lake shop was completed and large sums of money had been expended in conjunction therewith, there was little choice but to begin manufacturing and selling synthetic bows, even though Mr. Rolland continued to re-negotiate and would never sign a written contract based upon oral understandings. Manufacturing and marketing of synthetic bows in Salt Lake City started in September 1997 under auspices of PPPI, while Mr. Rolland unexpectedly remained in France. Mr. Rolland earlier stated he would close his shop in France in December 1997, which he did not.

46. Upon or shortly after the creation of SFAB in December 1997, based upon Mr. Rolland's promise to close his shop in France, PPPI/PPS discontinued manufacture and sale of synthetic bows and SFAB became the successor. Mr. Rolland does not complain about the manufacturing of synthetic bows by PPPI/PPS between September and December 1997, nor of synthetic bows made by SFAB while he was in Salt Lake City.

47. Mr. Rolland, because his French business was doing poorly, closed his shop in France late summer or early fall 1999.

48. In early October 1999, Mr. Rolland began his W4 employment with: a) SFAB in the manufacture of synthetic bows; and b) PPS in teaching at the bow making school. Mr. Rolland's teaching commitment was oral, but was for five years.

49. In about May 2001, after less than two years, Mr. Rolland terminated employment with PPS and SFAB and moved to Boston.

50. Nothing complained of by Mr. Rolland in the relationships between Mr. Rolland and PPPI/PPS and/or SFAB pertaining to the making of selling synthetic bows has anything whatsoever to do with the State of Massachusetts. The only event touching on Massachusetts is that Mr. Rolland chose to move there.

51. With the exception of Mr. Rolland, all of the witnesses in this matter are in Utah, all of the evidence is in Utah and all of the critical events took place in Utah.

52. It would be an undue, unreasonable and inequitable burden and unjust for this matter to remain in Boston simply because Mr. Rolland chose to move there.

53. There were substantial defects in some of the Rolland SPICCATO bows made in France and problems in respect to the technology used by Mr. Rolland to make SPICCATO bows in France. Some of these defects and problems persisted when SPICCATO production in Salt Lake City began (as shown in the several pages of attached Exhibit "V".) These defects and problems included, but were not limited to:

    a. a problem concerning the diameter of the hole in the mechanism;

    b. braid material problems;

    c. paint and side weakness problems;

    d. varnish problems;

    e. weight problems;

    f. problems concerning squish, non-pressure, non-heating molding techniques;

    g. variations in sound produced with time;

    h. service and repair;

    i. lack of stick strength;

    j. warping of the stick; and

    k. stick warpage.

54. The number and frequency of defects and problems have greatly decreased during manufacturing in Salt Lake City under the auspice of SFAB. Among other things, heat based injection molding is utilized with new multi-cavity molds.

55. The quality of nearly all bows produced by SFAB, since Mr. Rolland moved from Salt Lake City to Boston, is extremely high, higher than SPICCATO production has ever been.

56. I am not aware of any synthetic bow of poor quality or with a defect, which has been sold into Massachusetts since Mr. Rolland moved from Salt Lake City. Only a very small number of synthetic bows on an intermittent basis have been sold by SFAB into Massachusetts, mostly to Johnson String Instruments ("Johnson") in Boston, an independent contractor.

57. Susan Horkan, head of sales for Johnson made the following statement in Strings Magazine, April 2004:

> The Spiccato bows are a recent addition to our inventory and thus far the feedback has been extremely favorable. Players find these sticks to be very strong and responsive; and pull a clear full tone from the instruments. A wide range of players have purchased these bows from beginners to professionals.

See attached Exhibit 'V.' Note from Exhibit "V" that the advertising of Johnson is silent as to Mr. Rolland, SFAB and the SPICCATO bow.

58. Another reviewer, Mr. Wilson concurred "My sense is that Spiccato bows are made in a more exacting sort of way." Wilson enjoys being able to adjust the camber of the Premiere, and he's drawn to the workmanship of the three bows we tested. "Not an inch of bow is wasted here," he says. "They seem to be made with a fine tolerance." See Exhibit "V."

59. I have never acted in a personal capacity in respect to the alleged wrongs set forth in the Complaint in this matter, nor have I ever directed SFAB or any other business to dishonor or violate the rights of Benoit Rolland.

60. I have never had any personal activities which created a personal jurisdiction presence in Massachusetts, including but not limited to conducting any personal business in the State.

61.  I have never conducted business on behalf of PPPI/PPS in Massachusetts, except for one sale of a SPICCATO bow made by Mr. Rolland in France and sold by PPPI in 1994.

62.  SFAB is the complete successor in interest of PPPI to all synthetic bow business, activities, manufacturing, sales, advertising, etc. PPPI/PPS has not been in the business of marking and selling synthetic bows since SFAB became the successor to that part of PPPI/PPS's business.

63.  Until the present Complaint, PPPI/PPS, SFAB, Mr. Rolland and legal counsel have individually and collectively acknowledged and admitted that: (a) SFAB is the entire successor in interest to the earlier synthetic bow business of PPPI/PPS; and (b) that any business done in Massachusetts was done only by SFAB and no other Defendant. See attached Exhibit "X" through "Z", "AA" through "DD", wherein it is apparent that all written contract proposals to either license or resolve the Utah-based dispute of this litigation reference only Mr. Rolland and SFAB, i.e.:

   a.  Exhibit "X" - A proposal by Mr. Rolland and SARL Benoit Rolland, while Mr. Rolland was still in France, to PPS where PPS was changed by hand to SFAB;

   b.  Exhibit "Y"- A proposed Intellectual Property Rights Agreement with SFAB advanced by Mr. Rolland and SBR while Mr. Rolland was still in France. See the preamble.

   c.  Exhibit "Z" - A proposal between SFAB and Mr. Rolland while Mr. Rolland was in Salt Lake City.

   d.  Exhibit "AA" - A proposal Agreement made to SFAB by Mr. Rolland after Mr. Rolland had moved to Boston.

  e. Exhibit "BB" - A proposal made to SFAB by Mr. Babineau of Fish and Richardson on behalf of Mr. Rolland after Mr. Rolland moved to Boston. Note the concession made by on behalf of Mr. Rolland in Paragraph 2, i.e.:

> Spiccato French-American Bows, Inc., a corporation existing under the laws of State of Utah with a principal place of business in Salt Lake City, Utah ("SFAB"), <u>successor in interest with respect to the subject matter of this Agreement to Peter Prier & Sons Inc.</u>, a corporation existing under the laws of State of Utah with a principal place of business in Salt Lake City, Utah ("PP&S"), and Benoit Rolland, an individual residing at 21 Prescott Street, Charlestown, Massachusetts 02129 ("Rolland"). (Emphasized.)

  f. Exhibit "CC" - A term sheet on behalf of SFAB sent to Fish & Richardson proposing settlement between SFAB and Mr. Rolland.

64. In a letter, attached as Exhibit "DD", to Mr. Babineau of Fish & Richardson counsel for SFAB made it clear that settlement communications sent into Massachusetts concerning the Utah dispute would not create a basis for jurisdiction or venue in Massachusetts. Specifically, see the last paragraph which states:

> This letter is written not to create a basis for jurisdiction and/or venue in Massachusetts but only as a response to your letter of 3 May 2002.

65. I don't believe attempting to settle a Utah based dispute by use of counsel communicating a settlement proposal is like negotiating a business contract. I see no other way to endeavor to settle the Utah dispute between SFAB and Mr. Rolland, where Mr. Rolland has relocated to Massachusetts.

66. The intermittent synthetic bow business done in Massachusetts by SFAB since Mr. Rolland left Utah has not been continuous, symmetric or substantial.

67. Further, the synthetic bow business done in Massachusetts by SFAB since Mr. Rolland left Utah does not correlate to any claim asserted by Mr. Rolland in the Complaint. Exclusive of SFAB, none of the other Defendants has done any business of any type in Massachusetts after Mr. Rolland left Utah and in any way pertaining to the claims of the Complaint.

68. My understanding is that SBR was the owner of the marks "B. Rolland" and "Benoit Rolland" for use on synthetic bows.

69. As mentioned above, PPPI was a part owner (shareholder) in SBR and never consented to any transfer from SBR to Mr. Rolland personal of the marks "SPICCATO", "B. Rolland" and "Benoit Rolland" in respect to synthetic bows. So, SBR was the owner and Mr. Rolland never became the owner of these three marks though any approved and lawful transfer to him.

70. There never was a common enterprise, including but not limited to an at-will general partnership in Salt Lake City. PPS is a separate corporation and never was and is not in partnership with me, Peter Paul Prier, Jon Hatch, SFAB and/or Mr. Rolland.

71. SFAB is a separate corporation and never was and is not in partnership with me, Peter Paul Prier, Jon Hatch, PPS and/or Mr. Rolland.

72. PPS and SFAB have separate physical locations, though near to each other, separate employees, separate payrolls, separate assets, separate accounting systems, separate tax returns, among other separate things.

73. While in Salt Lake City, Mr. Rolland was not an owner of anything, other than perhaps some intellectual property he claimed to own (as opposed to intellectual property owned by

SBR) and made available to SFAB. That was his choice. Mr. Rolland was never a shareholder of SFAB or PPPI/PPS, nor did he obtain ownership of anything from Peter Paul Prier, Jon Hatch and/or Paul Stewart Prier. The relationship, at Mr. Rolland's request, was: (a) W4 employment and (b) an independent contractor making intellectual property Mr. Rolland claimed he owned available first to PPPI and later to SFAB. If he was a partner, which he was not, I am advised he is jointly liable for all of the liabilities of the alleged partnership, including his claim for royalties and annual compensation, and unpaid salary to Paul Stewart Prier, among other debts.

74. As Mr. Rolland knows, none of the individual Defendants undertook any personal obligation to Mr. Rolland nor to SBR concerning his synthetic bow. Mr. Rolland and SBR initially had independent contractor dealings concerning the synthetic bow with PPPI and later with SFAB concerning the synthetic bow. In teaching at PPPI/PPS's bow making school, Mr. Rolland was a W4 employee.

75. Mr. Rolland provided his intellectual property (whatever that might have legitimately been) in Utah on an ill-defined compensatory basis which Mr. Rolland constantly attempted to change.

76. There is no evidence of which I am aware demonstrating that Mr. Rolland ever personally owned the marks "SPICCATO", "B. Rolland" and "Benoit Rolland." Mr. Rolland admits the mark "SPICCATO" was owned in Europe by SBR, not Mr. Rolland personally. Since SBR used "B. Rolland and "Benoit Rolland" on synthetic bows and Mr. Rolland, in a personal capacity, did not, I believe SBR owned all three marks. There was never a shareholder meeting approving sale of these trademarks from SBR to Mr. Rowland and, therefore, Mr. Rolland is not a trademark owner.

16

77. If Mr. Rolland's theory of a general at-will partnership were to be sustained, Mr. Rolland's contribution to the partnership would have been his intellectual property, which in my opinion, would have terminated his earlier oral claim to royalties for use of the intellectual property by the partnership. He was either a licensor of intellectual property or a partner, who contributed intellectual property to the partnership, but not both.

78. If there was a general partnership, there was no agreement allowing Mr. Rolland to have exclusive quality control of synthetic bows produced in Salt Lake City, nor was there an agreement that Mr. Rolland could dissolve the alleged partnership based upon a naked assertion of lack of quality control or dictate to the alleged partnership that it would be required to stop using trademarks earlier used by SBR.

79. In fact, quality control in Salt Lake City is excellent and much better than in France.

80. If there is a general partnership, as alleged in the Complaint, it is a Salt Lake City partnership, and, no ground whatsoever exists for dissolving it.

81. To the extent there is goodwill in the United States as to the marks "SPICCATO", "B. Rolland" and "Benoit Rolland" in respect to synthetic bows, such goodwill belongs to the Salt Lake City enterprise, not Mr. Rolland. Mr. Rolland has never, in a personal capacity, used any of these marks on synthetic bows.

82. Earlier in France, these marks were used by SBR and since about January 1998 in the United States exclusively by SFAB, which owns the goodwill. If it is determined that a general partnership somehow exists, as claimed by Mr. Rolland, the goodwill associated with these three marks concerning synthetic bows is that of the partnership, not Mr. Rolland.

Under penalty of perjury, I swear the foregoing to be true.

_____
PAUL STEWART PRIER

7/20/04
_____
DATE