UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BENOÎT ROLLAND,<br><br>    Plaintiff,<br><br>v.<br><br>PETER PRIER & SONS VIOLINS, INC.,<br>SPICCATO FRENCH AMERICAN BOWS,<br>INC., PETER PAUL PRIER, PAUL STEWART<br>PRIER, and JON HATCH,<br><br>    Defendants. | Civil Action No. 04-11491 RWZ |

### DECLARATION OF BENOÎT ROLLAND

I, Benoît Rolland, declare as follows:

1. I am a resident of Charlestown, Massachusetts, residing and working at 21 Prescott Street, and a citizen of the Republic of France. In 2001, I was granted a permanent resident visa in the United States as an Alien of Extraordinary Ability for my skill in the art of violin bow making.

2. I am the plaintiff and the inventor of the SPICCATO and ARPÈGE bows at issue in this action. Before this action was filed, I carefully reviewed the allegations in the Complaint and verified all the facts stated there which were based upon my personal knowledge. I am providing this declaration based upon my personal knowledge of defendants' contacts with Massachusetts and the harm they are causing me here.

3. In the classical string music world, New England is a location of utmost importance and established artists and artisans here receive attention worldwide. This is due to the long history and tradition of excellence in classical music in New England, evidenced by the number of music schools, orchestras, music performances and famous musicians having their home here. Two major auction-houses for string instruments are also in Boston. As I prepare this declaration, students and faculty are returning to Boston for the fall semester, and summer music

8. In 1994, defendant Peter Prier personally invested about $40,000 (US) in my French company and defendant Peter Prier & Sons Violins, Inc. became distributors in the United States of SPICCATO bows that were made under my direct supervision in my company in France.

9. Starting in about 1996, defendant Peter Prier repeatedly requested and urged me to permit the Prier family to have exclusive rights to manufacture the SPICCATO bow in the United States and sell it worldwide. In 1997, defendant Peter Prier proposed in writing that a company be formed to exploit these rights and that I would receive a 30% share in the "net profits" of the company. Peter Prier's original proposal, which was faxed to me in France, is attached as Exhibit 1. This proposal was made by Peter Prier and shows "Paul Prier" as the signatory on behalf of Peter Prier & Sons Violins, Inc.

10. At the request of Peter Prier and in the course of our business negotiations, I agreed to instruct Paul Prier and Jon Hatch in the details of the manufacture of the SPICCATO and ARPÈGE bows, including trade secret formulas and methods. In July 1997, I taught Paul Prier and Jon Hatch the manufacturing process in France. They left France with detailed videotapes of the manufacturing process and molds that I had made for the SPICCATO and ARPÈGE bows.

11. In 1999, after meeting personally in Paris, Peter Prier stated, "I will sign this agreement" in reference to a French language contract originally drafted and proposed by lawyer, which was intended to memorialize our relationship. At this point, Peter Prier's plan and wish was that I would agree to move the manufacture of the SPICCATO and ARPÈGE bows to the Priers' facilities in Utah, and I would also move to Utah. There were two purposes – to participate in the bow-making school and to assist in bow manufacturing.

12. Later in 1999, upon my arrival in Utah, Paul Prier handed me a document entitled "Spiccato Business Plan," which is attached as Exhibit 2. This document appeared to detail various capital accounts and loans to defendant SFAB, to estimate the projected costs of manufacturing and sales of SPICCATO and ARPÈGE bows, as well as likely the production amounts, revenues, and net profits for the period from November 1999 through December 2001. Among other things the "SPICCATO Business Plan" refers to "Peter's personal loan," "Jon's

3

wage," and "Paul's expense," on page 1, and "Peter's Personal Investment" and "Shop's [i.e., Peter Prier & Sons Violins, Inc.] Investment" on page 2.

13. The "Spiccato Business Plan," Exhibit 2, does not show any wages to me as an employee as a "monthly expense," see page 1, because I was never an employee of SFAB. I was a partner in a business venture. When Paul Prier attempted to pay me as an employee of SFAB, I immediately told him I was not an employee, and I received no further checks or wages from SFAB or for any of my work for SFAB. My compensation for the SFAB venture was to be by royalties and net profits. Peter Prier is being misleading in his declaration when he says I "began" W-4 employment because he left out that he paid me as an employee of SFAB without my permission, that I required him to stop and never again pay me as an employee of SFAB, and he did so.

14. I was an employee of the Bowmaking School, which gave instruction in making traditional wooden bows and which I was told was a separate corporation set up and owned by Peter Prier.

15. I have made repeated requests for accounting of defendants, including through counsel, of the profits of the SFAB venture after receiving the initial "Spiccato Business Plan," Exhibit 2, to which they have never responded, even though they have admitted they owe me royalties. Their counsel, Mr. Foster, wrote a letter to my prior counsel in November 2001 stating, "There can be no serious question that Spiccato French American Bows became the exclusive manufacturer and marketer for both the Spiccato and the Arpège bows in the United States. . . . In return for the rights to exploit the Spiccato bow, Mr. Rolland has received cumulatively a large sum of money and royalties continue to accrue." The letter is attached as Exhibit 3.

16. Defendants' refusal to pay royalties and account for and pay profits of the venture has caused me severe financial hardship ever since I left France. It was Peter Prier's idea that I close my business in France so that he could have "exclusive" rights to the bow technology and manufacture, which left me without any income from my own manufacture and sale of carbon

paragraph 45, describes as "heat-based injection molding" with "multi-cavity molds." In the Supplemental Declaration of Jon Hatch, paragraph 22, he states:

> Mr. Rolland's archaic technology for making synthetic bows did not allow for consistence [sic] in quality. SFAB began looking for better resins to replace the inferior resins of Mr. Rolland and contacted Radius Engineering of Salt Lake City to develop multi-cavity molds to be used with injection molding. The process took considerable time because of corrections to the molds, among other things. In about January 2002 testing with the new multi-cavity molds began. Commercial production using the new multi-cavity molds and better resin started in about July 2002. The quality of synthetic bows made with the new molds and the new resin is significantly higher than bows made using Mr. Rolland's resin and squish molds.

I have suspected that defendants changed the process based upon bows I first saw in the marketplace in December 2003 that exhibited serious defects. The defendants' declarations show that my suspicions were correct.

25. In December 2003, I personally examined a SPICCATO bow and an ARPÈGE bow at Johnson String Instruments in Newton, MA. When I examined the bows at Johnson String Instruments in December 2003, I determined that the molds being used for the SPICCATO and ARPÈGE bows are now identical; this is a critical design change that defendants made without my authority. It is a severe design and manufacturing flaw, which I will explain below. I also determined that the method of manufacture of the bows had changed in a way that made the bows stiff, uneven, and defective, as I will explain below.

26. I defined the manufacturing techniques and standards for the defendants' manufacture of SPICCATO and ARPÈGE bows. These standards were based upon my long research, development, and successful commercial manufacture of SPICCATO and ARPÈGE bows in France. One of the most important aspects of the manufacturing method is the organization and placement of the carbon fibers in the molds. The carbon fibers are impregnated with resin and then placed in the mold by hand. It is critical to place the fibers carefully and consistently by hand according to my standards to insure the proper characteristics of the final bows.

7

27. The initial production of bows by SFAB was done according to my standards and was done in molds that I had personally created in France and sold to SFAB for this purpose. My standards included rigorous technical and visual quality control after the bows are made.

28. The ARPÈGE bow is not an adjustable bow. The camber, or amount of bend, in the ARPÈGE bow is changed by the player during use. The SPICCATO bow is adjustable via the internal tensioning mechanism, which is the subject of my patent for adjustable carbon fiber bows. The ARPÈGE and the SPICCATO bows always had purposely separate molds with different characteristics. It is virtually impossible to make both correctly using the same mold, but that is what defendants are now doing.

29. At Johnson String Instruments in December 2003, I observed that both the SPICCATO and ARPÈGE bows were made from the same molds. I also observed that most or all of the ornamental design details that visually distinguished the two bows from each other had been removed so that bows appeared virtually identical to the consumer. This is also not in accordance with the standards I set so that the SPICCATO bow, which is more expensive that the ARPÈGE and has a greater technical range, would be clearly and separately identifiable to the public as the two different bows that they are.

30. In December 2003, I also observed the extremely severe defect that the bow was not homogeneous in its physical characteristics along its entire length. Specifically, some parts of the SPICCATO bow were quite weak (in the middle of the bow I examined in December) while other parts were excessively stiff (right behind the head). This inhomogeneous characteristic was also present in the ARPÈGE bow, which, as I have mentioned was made from the same mold as the SPICCATO bow. This is a severe defect for any bow because it results in uneven playing. When the SPICCATO bow having this defect was tightened, as the musician might do, these differences were further exaggerated resulting in a bow that was not only uneven in playing but also actually difficult to control on an instrument: it may inappropriately bounce on the instrument.

31. Defendants claim that they made changes to their design and manufacturing after January 2002. However, I keep myself informed of the quality of the SPICCATO and ARPÈGE bows being sold and December 2003 was the first time I saw any bows with the defects that I have described.

32. I recently returned to Johnson String Instruments to see whether or not the bows were available and to examine them for their properties. When I visited the store on August 9, 2004, there were 19 SPICCATO and ARPÈGE bows in stock. The value of this merchandise is approximately $13,000 retail. This was described to me by the merchant as a "recent shipment." I noticed that some of the bows had fraying of the hairs, which indicates to me the possibility that the bows were used and returned. Not one bow in stock at Johnson String Instruments appeared to be correctly made.

33. I photographed the bows while at Johnson and borrowed two of the bows to examine them more carefully. The bows have warps along their length and are not uniform due to the improper arrangement of fibers. Both of these factors result in an inferior bow with non-uniform characteristics along its length. From this examination, I have prepared a comparative photograph to demonstrate the defects in the current bows, which is Exhibit 7. As one can see with the naked eye, the SPICCATO bow borrowed from Johnson String Instruments warps under tension while the properly made bow (i.e., a SPICCATO bow made according to my manufacturing standards shown upper right in Exhibit 7) is absolutely straight under the same tension. I am able to present both bows photographed in person to the Court and to demonstrate the defect in the current SPICCATO bows, if called upon or permitted to do so.

34. Throughout my career, I have always devoted myself to the latest technology. The use of new technology does not mean *per se* that the end product shall necessarily be of higher quality: a misconceived design processed with a high technology tool will produce a defective bow and this is what has happened with the "new" process that defendants claim is "improved." It may be and probably is cheaper for defendants to manufacture the bows, but the bows that

9

result are defective and not in any way improved. I favor new technology whenever it is properly handled.

35. As a result of these defects, both the SPICCATO and ARPÈGE bows as currently manufactured are excessively stiff and without nuance; the sensitivity of the bows as designed and manufactured according to my specifications was central to the acceptance, success, and fame of the bows in the musical world. For example, Jean-Luc Ponty, one of the world's greatest living violin artists endorsed the SPICCATO bow that I personally made for him in France and in accordance with my stringent product design and manufacturing standards. Since 1994, he uses only SPICCATO bows that I have made for him in performance and recording.

36. There is no question that Mr. Ponty's endorsement of the SPICCATO bow is personal to me and to the bows made in accordance with the standards I set for their manufacture. I attach as Exhibit 8 a letter from Mr. Ponty to me dated February 25, 1994, in which he approved his endorsement. The letter is in French, but the first paragraph that appears in quotes, near the bottom of the page, as translated into English appears on the "testimonials" page of SFAB's website as of January 9, 2004:

> Jean-Luc PONTY: I dreamed of a bow that was in harmony with my modern violins. Benoît ROLLAND has realized that dream and has even gone further, as his revolutionary concept enables me to have several bows in one."

A copy of this "testimonials" page as it appeared in 2001 is attached as Exhibit 9.

37. Each of the other artist endorsements shown on Exhibit 9 was obtained by me personally for SPICCATO bows made in accordance with my standards between 1993 and 1998, before defendants even began manufacturing SPICCATO bows. The defendants just recently changed their website to remove my name and image from it entirely. However, they have retained all of the artist endorsements of Exhibit 9 on their newly revised website, see Exhibit 10, which makes them even more misleading than before. Both the January 2004 and August 2004 versions of defendants' websites are being submitted in full on a disk so that the Court can navigate the links and see it as members of the public do.

38. For example, the quote attributed to Mr. Ponty, "you created the bow of the 21st century, my favorite" is extremely misleading. The original version of this quote started, "Bravo Benoît...."

39. The defendants' suggestion that the earlier, approved use of my name and artists' endorsements on SPICCATO bows made <u>according to my standards</u> somehow authorizes defendants to use my name and the artists' endorsements forever, even on severely defective bows that result from a radical and unapproved design and manufacturing change, is incredible to me. The defendants continuing use of my name and the artists endorsements also deceives the public into thinking that what they purchase today is the same quality bow that was designed by me and endorsed by these artists. It also harms my relationships to these prominent artists who would not like to know that their endorsement is being applied to a bow of inferior quality and who have been or are, from time to time, my clients for traditional wooden bows.

40. The defendants' admitted design and manufacturing changes, and the resulting bows, which I assert are defective, are being sold in Massachusetts with my name on them and being promoted in connection with my name pose serious and immediate harm to my reputation and livelihood here. My name is engraved as "B. Rolland" on each bow. See Exhibit 11, which show close-up photos of my engraved name on a SPICCATO bow. The bows are being promoted here in Massachusetts and elsewhere using my name and image.

41. Throughout my career, I have been careful to be known always as a person of whom the highest standards of quality, professionalism and musicianship could be expected. The presence in Massachusetts of defective bows bearing my name poses special harm to me as I have now run my bow making studio here for three years and have significant and important clients at the highest level of the profession who live, perform, teach, and visit Massachusetts, including visiting me in my studio. Over the past 30 years, since I graduated from Mirecourt, I have constantly been making traditional wooden bows for the major soloists of our time: Menuhin, Rostropovitch, Grumiaux, Grappelli, Suk, Szerink, Ferras, Schiff, and many others played my bows. Each bow is separately numbered.

42. Since I located my studio in Massachusetts, I have met the new generation of musicians mainly in Boston or Tanglewood, the summer home of the Boston Symphony orchestra. In Boston, I either visit my clients at the Symphony Hall or they come to my studio in Charlestown.

43. In 2003 and 2004, I created on commission Pernambuco bows, which are traditional wooden bows for Anne-Sophie Mutter (bow #1088), Lynn Harrel (bow #1051), and Christian Tetzlaff (bow #1056). For making each of these customized bows of very high standard, I have active communication (e-mail correspondence, telephone calls, several visits) with these luminaries here. I am much honored at their interest in and appreciation for my work. They all play my bows in concerts, including major stages like the Kennedy Center, NY and Carnegie Hall.

44. Mrs. Mutter, Sir Andre Previn and Mr. Harrel last visited my wife and myself on April 2004 in Boston when they played a performance at Symphony Hall. Mrs. Mutter played the Symphony Hall performance with the bow I made for her (bow #1088), which she had just received from me that day in Boston.

45. The Tanglewood Festival is a place where I particularly take time working with my clients. This July 18th, I visited Joshua Bell at Tanglewood who selected bow # 1091 and scheduled a further appointment with me in to try additional bows. There I also visited Yo-Yo Ma on August 7th, and we scheduled a further meeting. On August 19th, I had a long work session in Tanglewood with Christian Tetzlaff, who has used my bows for many years.

46. During the afternoon rehearsal, he compared an historical bow (Dominique Peccatte) with one of my bows and judged that mine was superior; he used it during the night concert as he usually does.

47. I meet Jean-Luc Ponty each time he plays in Boston or teaches at Berklee School of Music. As mentioned on his recordings and website, Jean-Luc Ponty records and performs exclusively with my SPICCATO bow since early 1994.

12

48. Recognizing my work as a contemporary art form, the Isabella Stewart Gardner Museum in Boston will celebrate my thirty years of bow making on October 16th 2004 with a lecture and presentation.

49. I have made bows for several members of the Boston Symphony Orchestra, including Concertmaster Malcolm Lowe (bow #1048).

50. In November 2002, a Boston-based music critic published an article about my work in the Wall Street Journal. Exhibit 12.

51. I am regularly contacted to give lectures and reference articles within the profession.

52. I recently discovered that a collector residing in Lincoln, MA owns one of the very first bows that I made, in my very first Paris Studio in 1976.

53. I cannot allow the distribution in Massachusetts of defective SPICCATO bows with my name on them: students and teachers at music schools and professional musicians in performing arts groups will be severely disappointed in the quality and performance of these bows and the disappointment and harm to goodwill that will be most injured is my own, both for the SPICCATO bow and for the traditional wooden bows that I have made for artists here in Massachusetts.

54. Because of defendants' promotion of the SPICCATO bow with my name and image for many years, my name appears on numerous websites of string instrument companies, teachers, and individuals. I attach the website of Johnson String Instruments of Newton, MA, as one example of how my name appears always asssociated with the SPICCATO bow. For this reason, it is important than the defendants be required to notify dealers and retailers that the SPICCATO bow is made by a new process that I no longer endorse. I have been careful not to make any such statements personally to any dealers or retailers while this action is pending and instead seek the approval and understanding of the Court as to why this requested notification is important to quickly disassociate myself with the defendants' current SPICCATO bow.

55. The defendants' suggestion that this dispute has nothing to do with Massachusetts except that I decided to live here seriously misstates matters. The defendants have been continuously trading on and profiting enormously from my inventions, the recognition associated with the SPICCATO bow that I created in France and introduced to the United States, and my own name and reputation as a craftsman who applies the highest standards to sell SPICCATO bows. Now, three years after I have located to Massachusetts, a place where I saw the possibility to revive my traditional wooden bow studio (and have a livelihood) with a world-class clientele, the defendants are selling the defective re-designed SPICCATO bows with my name on it in large numbers here, threatening my reputation and risking immediate and permanent harm.

SWORN TO UNDER THE PAINS AND PENALTIES OF PERJURY UNDER THE LAWS OF THE UNITED STATES THIS ___ DAY OF AUGUST, 2004.

*/s/ B. Rolland*

Benoît Rolland

20920359.doc