UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BENOÎT ROLLAND<br><br>　　　　Plaintiff,<br><br>vs.<br><br>PETER PRIER & SONS VIOLINS, INC.,<br>SPICCATO FRENCH AMERICAN BOWS,<br>INC., PETER PAUL PRIER, PAUL<br>STEWART PRIER, and JON HATCH.,<br><br>　　　　Defendants. | Civil Action Number: 04CV11491 RWZ<br><br>**MEMORANDUM ON BEHALF OF<br>PETER PAUL PRIER AND PETER<br>PRIER & SONS VIOLINS, INC. IN<br>OPPOSITION TO PLAINTIFF'S<br>MOTION FOR PRELIMINARY<br>INJUNCTION** |

## I. INTRODUCTION

Defendants Peter Paul Prier (Peter) and Peter Prier & Sons Violins, Inc. (PPS) submit this

Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction.

## II. STATEMENT OF FACTS

### A.  Peter and PPS Have no Jurisdictional Contacts With Massachusetts

1.　　　Peter has never personally transacted any business of any type in Massachusetts.

Peter Decl. ¶ 22.[1]

2.　　　In the last 25 years, Peter was in Boston and Massachusetts once, about 15 years

ago. Peter Decl. ¶ 22.

3.　　　At all times relevant Peter operates PPS (Peter Prier & Sons Violins, Inc.) full

time on a day-to-day basis. Peter Decl. ¶ 21.

4.　　　Peter is not involved in the day-to-day operation of SFAB (Spiccato French

---

[1] "Peter Decl." refers to the Declaration by Peter Paul Prier, filed on July 30, 2004.

1

American Bows, Inc.). Peter Decl. ¶s 3, 4, 21.

5.      In the past 25 years PPS has had no business in Massachusetts, with one exception- a SPICCATO bow made in France and sold into Massachusetts in 1994. Peter Decl. ¶s 23 and 39. Peter Supp. Decl. ¶ 5.[2]

6.      PPS has not made and sold synthetic bows since December 1997. Peter Decl. ¶s 27, 38 and 47.

7.      Peter has never been involved in the manufacturing, marketing, advertising or quality control of synthetic bows by SFAB. Peter Supp. Decl. ¶ 3.

8.      Peter has performed no service, solicited no business, sold no goods and engaged in  no act in Massachusetts for SFAB. Peter Supp. Decl. ¶ 6.

9.      Peter has personally done nothing in Massachusetts for any partnership. Peter Supp. Decl. ¶ 4.

10.      Only SFAB, and not Peter or PPS, promotes synthetic bows. Peter Supp. Decl. ¶ 14(h).

11.      Effective December 1997, PPS assigned to SFAB all of its synthetic bow rights. Peter Decl. ¶s 38, 47 and Exhibit "U."

12.      Since 1994, Peter has performed no service, solicited no business, sold no goods and engaged in no act in Massachusetts. Peter Supp. Decl. ¶ 5.

13.      The website of PPS is passive and has provoked no Massachusetts business. Peter Supp. Decl. ¶ 8.

---

[2] "Peter Supp. Decl." refers to the Supplemental Declaration by Peter Paul Prier, filed on July 30, 2004.

14.     Peter and PPS do not have a personal jurisdictional presence in Massachusetts.

**B.  The Initial Relationship Was Between SBR (Not the Plaintiff) and PPS.**

15.     Peter became aware of Mr. Rolland and his French company, SARL Benoit Rolland, aka La Sociéte Benoit Rolland (SBR) in about 1992. Peter Decl. ¶ 9.

16.     Mr. Rolland had devised a synthetic bow, called the SPICCATO. Peter Decl. ¶ 10.

17.     PPS bought some SPICCATO bows from SBR, not Benoit Rolland. Peter Counter Decl. ¶ 10, Exh. "1," (a 1993 SPICCATO shipping receipt from SBR).[3]

18.     PPS, sold the Spiccato bows at retail. Peter Decl. ¶ 12, Exh. "D."

19.     Parts for making the SPICCATO bows in France were purchased by SBR, not Mr. Rolland. Peter Counter Decl. ¶ 11 and Exhibit "2."

**C.  The Next Relationship Between SBR and PPS Was One of Manufacturer/Distributor**

20.     Later, PPS (and not Peter, Paul or Jon) became a distributor in the U.S. of SPICCATO bows for SBR. Peter Counter Decl. ¶ 12, Exh. "3" (pointing out clearly that PPPI, not the individuals, was to be the distributor), Exh. "4," ("$568.00, plus shipping from P.P.P. Inc."), Exhibit "5," ("OK for all orders and payments to go through PPP"), and Exh. "6," (" a new document about SPICCATO on which I quote your name (P.P.P. Inc.) and explain you are only one agreed firm for U.S.").

21.     PPS, as a distributor, purchased French made SPICCATO bows from SBR, not Mr. Rolland. Peter Counter Decl. ¶ 13 and Exhibit "7," ("a wire transfer to SARL BENOIT ROLLAND, the French company).

---

[3] "Peter Counter Decl." refers to the Counter Declaration by Peter Paul Prier, dated September 2, 2004, filed herewith.

**D.  The Next Relationship Between SBR and PPS Was One of Company/Shareholder**

22.     Later, PPS invested $40,000.00 in SBR and became a shareholder (owner) of an undivided 13%. Peter Decl ¶ 13, Exhs. "E," "F."

23.     PPS's ownership interest in SBR rose to about 45%. Mr. Rolland typically calls investors and shareholders "partners." Peter Decl. ¶ 14 and Exhibit "G."

**E.  The Next Relationship- PPS Bought the Assets of Financially Troubled SBR and Started Manufacturing Synthetic Bows in Salt Lake City**

24.     Mr. Rolland wished to close SBR. SBR's manufacturing capability was moved to Salt Lake City. PPS manufactured synthetic bows in Salt Lake for a short time.

25.     A new U.S. company to purchase the assets of SBR was intended, in which Mr. Rolland would be a part owner. Peter Decl. ¶ 12, Exhibit "O," p.19 ("I am convinced the SLC factory was the best stuff (1) to develop the Spiccato business"), Peter Supp. Decl. Exh. "Y,"p.1 ("our future company in SLC...50/50 you and me"), Peter Supp. Decl. Exh. "Y,"p.2 (" a company 50/50, with a permanent license agreement according to my patent") and Peter Supp. Decl. Exh. "Z," p.3 ("prepare our SLC factory...[SBR] makes no profit").

26.     Later, Mr. Rolland, to avoid a claim by his wife who was divorcing him, elected not to be a shareholder in SFAB. Peter Counter Decl. ¶ 55 and Exhibit "28," ("No problem for me if I am not involved [as part owner of SFAB]...I share a part of the profits."). Peter Supp. Decl. ¶ 14(g).

27.     PPS, one of the two shareholders of SBR, and/or SFAB purchased all or substantially all of the assets of SBR. Peter Counter Decl. ¶ 15 and Exh. "12," ("$54,333.000 were paid to the SARL Benoit Rolland [SBR]...buying...clients for carbon fiber bows.").

28.     As purchaser assets of SBR, PPS/SFAB received aluminum mechanisms, brass small tubes, workroom, mandrin and lathe information, wooden dowels, brass tubes, sandpaper, polishing compound, hand vices, thread, scales, braid, aluminum channel, saw, paints, frogs, cyanolite, accelerator, molds, foil gras, tools, sources of supply, vendors, list of dealers and screws. Peter Decl. Exh. "Q," and Peter Supp. Decl. Exh. "BB."

29.     For technical assistance Mr. Rolland was personally paid $3,000.00. Peter Counter Decl. Exh. "12."

30.     Mr. Rolland purchased none of the assets of SBR. Peter Counter Decl. ¶ 16, Peter Supp. Decl. ¶ 14 (av) and Exhibit "W."

31.     Peter later realized the asset purchase included the trademarks of SBR. Peter Counter Decl. ¶ 24.

32.     Mr. Rolland initially decided to "stop my company [SBR] in December [1997]...you [PPS] are able to make the Spiccato bows from now [October 1997] perfectly....I don't see any reason to keep my company [SBR] alive which is so expensive in France...prevents me to make wooden bows....I will have to make money under the table." Peter Supp. Decl. ¶ 14 (q), Exhibit "BB," September 15, 1997 letter from Mr. Rolland. Peter Decl. ¶ 45.

33.     Accordingly, PPS started manufacturing synthetic bows in Salt Lake City in about September 1997, expecting Mr. Rolland to arrive in late 1997, but instead he came in October 1999.

34.     Mr. Rolland authorized manufacture of SPICCATO bows in Salt Lake beginning about mid-year 1997 until December 1997. Peter Supp. Decl. ¶ 14(p).

## III. ARGUMENT

**A.  Much of the Plaintiff's Requested Injunctive Relief is Moot**

The Court need not consider some elements of the requested relief in the Motion for Preliminary Injunction because those elements are now moot. The uses by SFAB of the trademarks at issue have all been lawful and with the Plaintiff's absolute approval. Therefore, the Defendants need not consent to an injunction, but, to make this dispute smaller, PPS has elected to delete all reference to Mr. Rolland of any type from its website (priemviolins.com), placed there with Mr. Rolland's consent respecting his involvement with PPS's bow making school, and SFAB has removed all reference to Mr. Rolland of any type from its website (spiccato.com), has relinquished the domain names "brolland" and "benoitrolland," has removed all reference of any type to Mr. Rolland from literature and has removed B. ROLLAND from SFAB's synthetic bows. SFAB will not resume any of these acts during the pendency of this litigation and, likely not at all at any time. However, Mr. Rolland was never the user and never the owner of the trademarks "B. Rolland" and "BENOIT ROLLAND" and his image for synthetic bows. PPS obtained these rights to the marks "B. Rolland,"  "BENOIT ROLLAND" and his image for use on and in connection with synthetic bows when it bought the assets of SBR.

Mr. Rolland's commercial insignificance is attested to by Wayne Burak:

> Wayne Burak and Associates is a high end string instrument retail shop and has been for many years. Whether Benoit Rolland's name is on the bow or it is not is irrelevant to sales. Few people know of him and his name association with the bow is inconsequential.

See, Burak Decl. ¶ 8.[4]

Should the Court determine that somehow, mystically, SBR transferred its trademark rights in "B. Rolland," "BENOIT ROLLAND" and Mr. Rolland's image for synthetic bows to one of two shareholders (Mr. Rolland), PPS being the other shareholder, without a shareholder's meeting and without a written assignment of title, SFAB is still the exclusive licensee from Mr. Rolland to use "B. Rolland,"  "BENOIT ROLLAND" and Mr. Rolland's image on and in conjunction with synthetic bows. Mr. Rolland's self-serving contentions that quality is down are patently false, as are many other assertions by him.

The endorsements of which Mr. Rolland complains are not his property. SFAB obtained many of them, through the efforts of Paul. They pertain to the SPICCATO bow, the quality of which is excellent and higher than ever before. See, Burak Decl. and Paul Second Counter Decl.[5]

The proposed order from Mr. Rolland's counsel does not ask any injunctive relief as to the marks SPICCATO or ARPÉGE.

The notification relief sought by the Plaintiff on page 2 of the Plaintiff's proposed order is affirmative and, therefore, outside the scope of injunctive relief. Furthermore, the affirmative relief requested is not supported by evidence satisfying  any of the four prongs in the test for preliminary injunction and would be in direct violation of SFAB's ownership or license of all marks (SPICCATO, ARPÉGE, B. ROLLAND and BENOIT ROLLAND).

In summary, there remains no preliminary injunction issue as to B. ROLLAND, BENOIT

---

[4] "Burak Decl." refers to the Declaration of Wayne Burak, dated September 14, 2004, filed herewith.

[5] "Paul Second Counter Decl." refers to the Second Counter Declaration of Paul Stewart Prier, dated September 15, 2004, filed herewith.

ROLLAND and Mr. Rolland's image. There remains one injunctive issue as to whether the Plaintiff owns the endorsements and has a right to seek an order prohibiting use of third party endorsements, after seven years of continuous use thereof (so there could be no recent irreparable harm issue), where the endorsers are necessary or essential parties, no endorser has been joined, where many, if not most of the endorsements were obtained by SFAB and where no endorser has requested discontinuance in SFAB's use of his or her endorsement. See, Burak Decl. and Paul Second Counter Decl.

**B.  Where Jurisdiction is Lacking, as Here, There is No Authority to Enjoin**

The Plaintiff presents absolutely no facts showing a personal jurisdictional presence in Massachusetts by either Peter or PPS. There are no such facts. See Facts 1-14, above.

The lack of personal jurisdiction as to Peter and PPS is analyzed in detail in the Memoranda in Support of Motion to Dismiss as to Peter and as to PPS for Lack of Personal Jurisdiction on file with the Court and incorporated herein by reference.

It is axiomatic that personal jurisdiction over a party is essential before the Court is empowered to issue preliminary injunctive relief and no personal jurisdiction exists over Peter and PPS.

**C.  Mr. Rolland, Lacking Trademark Ownership and the Right to Control Quality, is Not Entitled to Any Injunctive or Other Preliminary Relief.**

The synthetic bow making operation in France was by SBR, not Mr. Rolland. SBR placed SPICCATO and the other marks, as  SBR trademarks, on or in association with SBR's synthetic bows.

It was SBR which registered SPICCATO in France as its trademark, not Mr. Rolland.

8

Peter Supp. Decl.  Exh. "W."

The only thing Mr. Rolland personally contributed to the Salt Lake factory were personal service, i.e. $3,000.00 for technical support and $750.00 as wage from PPS's wooden bow making school. Peter Decl. Exhibit "P." The business assets of SBR were sold by SBR, not Mr. Rolland personally. For example, PPS and SFAB acquired from SBR the customer list [good will] and the right to sell synthetic bows to customers using the SBR technology. Peter Decl. Exhibit "P."

Earlier, PPS invested $40,000.00 and became a thirteen percent (13%) and later a forty-five percent (45%) owner (shareholder) in SBR. ¶ 31, Complaint. Fact 6. Peter Decl. Exh, "F," "G,"  "H," and ¶ 13.

Ownership of a trademark is obtained by the business enterprise which uses the trademark, not the shareholders of that business enterprise. SBR never transferred by written assignment its synthetic bow marks to anyone else, nor did the shareholders of SBR approve any such transfer.

U.S. law provides that a transfer of ownership of registerable and common law trademark rights is proper by written assignment (15 U.S.C. §§ 1057(d), 1060), a point conceded by Mr. Rolland. Complaint, ¶ 58.

Mr. Rolland was not the user of the marks in question in respect to synthetic bows made in France. SBR was. It was, therefore, impossible for Mr. Rolland to have become the owner of the trademarks through use. He could have become the lawful trademark owner only through transfer from the user SBR, which never happened.

Restated,  ownership of the marks  was originally vested in the French company SBR, not

Mr. Rolland personally. The synthetic bows initially were made and sold were by SBR in France. On these SBR bows were impressed the marks SPICCATO and B. ROLLAND. The actual user is the trademark owner.

> As made clear by <u>McCarthy on Trademarks</u>, § 16:4, @ 16-6:

>> ...the first to use a designation as a mark in the sale of goods or services is the "owner".

The first to use the marks at issue on synthetic bows and related advertising was SBR, not Mr. Rolland personally. Mr. Rolland recognized the first user and owner to be SBR, when he caused SBR to register SPICCATO in France. Peter Supp. Decl. Exhibit "W."

PPS became a shareholder in SBR (after SBR became the owner of the trademarks at issue here, through use) at 13% and later 45%. On no occasion was shareholder approval given for any express conveyance of these trademark rights from SBR to Mr. Rolland personally or to any other shareholder, i.e. PPS. Therefore, in the absence of any such bona fide transfer event, SBR remained the owner of the trademarks at issue, unless a transfer occurred by operation of law.

By operation of law, ownership of the marks at issue for synthetic bows did occur in favor of PPS/SFAB. The sale of the assets of SBR to PPS (Exhibit "P," Peter Decl.) and thence to SFAB (Peter Decl., Exhibit "U." ) transferred ownership of all marks and goodwill. <u>McCarthy on Trademarks</u>, § 18:32, @18-51 states:

>> When a business and goodwill are sold to another, the trademarks of the business pass, even though they may consist of the personal name of the assignor. If a person has sold a business which is identified by his personal name, the name is an asset which he has sold, and he cannot keep commercial control of the name and keep

the purchase price too. Of course, the seller can use his own name to identify himself, but he has sold the right to use the name as a commercial symbol-a trademark. When a person such as the president of a company allows the company to use his name as a trademark, he severs the name from himself personally. [*Richmond Nervine Co. v. Richmond*, 159 U.S. 293, 40 L.Ed. 155, 16 S.Ct. 30(1985)(the fact that a trademark bears the assignors name and portrait does not render it unassignable to another)]. (Other citations omitted.)

If it were determined that the sale of its assets by SBR to PPS and thence to SFAB did not convey title to the marks for synthetic bows, but rather that title thereto remained with dormant SBR, abandonment by SBR has occurred. SFAB thereafter appropriated the trademarks as new user and new owner.

SBR has been inactive and has not produced synthetic bows since Mr. Rolland moved to Salt Lake City in October 1999, if not before. There is and can be no evidence of either resumption of use or intent to do so by SBR, where Mr. Rolland the manager of dormant SBR, has a permanent work visa and intends to remain in the U.S..

15 U.S.C. § 1127 provides:

A mark shall be deemed "abandoned" when either of the following occurs:
(1)     When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of that mark in the ordinary course of trade, and not made merely to reserve a right in a mark.

Furthermore, Mr. Rolland relinquished to SFAB any claim he may have had to the mark SPICCATO. Peter Decl., Exhibit "L."

It is clear, Mr. Rolland personally is not and never was the owner of the marks asserted in this litigation. <u>McCarthy on Trademarks</u>, § 18-15, @18-28 states:

> To acquire title to a trademark...a person or company must be able to prove a chain of title extending back to the original user of the mark. To be able to maintain a lawsuit for infringement of a mark, a plaintiff must be able to document a chain of title which ends with itself. [Citing to *Nordco A.S. v. Ledes*, 44 U.S.P.Q.2d 1220 (S.D.N.Y. 1997) (plaintiff could not maintain a Lanham Act § 32 or a § 43(a) suit for infringement because it could not document a conveyance of title of the mark to itself).]

Mr. Rolland has never been the owner of the marks at issue, is not entitled to control SFAB's quality as a non-owner, has no cause of action for trademark infringement or unfair competition as a non-owner, has no trademark based injury as a non-owner much less an irreparable injury and, therefore, has no entitlement to injunctive relief in any court.

## D. **SFAB's Quality Has Never Been Better**

The quality of SFAB's synthetic bows is excellent, was excellent but is now better and is unexcelled. Wayne Burak, a professional cello player, plays with, endorses and sells SPICCATO bows. Mr. Burak states:

> ...the SPICCATO bow is of first class quality and this bow has everything a professional player needs....the current generation of SPICCATO bows is superior to the older generation of SPICCATO bows in playability, quality and esthetics and Spiccato French American Bows keeps improving their product....I currently endorse this bow and look forward to continuing to endorse this bow....the SPICCATO bow is of first class quality and this bow has everything a professional player needs. Customer service is excellent....the bow's reputation for quality keeps growing along with demand.
> I currently endorse the SPICCATO bow and look forward to continuing to endorse this bow.
> * * * *
>
> ...I personally use a SPICCATO bow and am and have always been fully satisfied, indeed impressed, with its quality.

See, Burak Decl. ¶s 3-7, 9.

As to the present and past quality of SFAB's SPICCATO and ARPÈGE bows, Nick

Hoffman an internationally famous violinist (fiddler) states:

> When I first played a Spiccato, I loved it. Plain and simple. I had always been a traditionalist when it came to bows, and within a few minutes the Original Spiccato made me a believer that modern technology can produce the same, or even better results as the time-tested wood bows.
>
> There wasn't much to improve on in the first bow I tried 4 years ago. But the tireless engineers at Spiccato kept saying, "Nick, try this new generation bow." And I'd say, "what was wrong with the last one?" Today's bows are even more structurally sound and can take more extreme adjustments then the early generation bows. They are more responsive and better balanced. Those are things that can only come through years or experience and experimentation.
>
> I use three bows nightly on stage. One is the first Spiccato I ever had. One is an Arpege, and the other is a brand new bow that is the latest and best Spiccato bow ever.
>
> Moral of the story: Spiccato has always made exceptional bows. But, they have always found ways to make a great thing better, and they always will.

Paul Second Counter Decl. Exhibit "A."

### E.  Mr. Rolland Satisfies None of the Four Elements Required for a Preliminary Injunction

In all federal circuit courts, the movant for a preliminary injunction bears the burden to

show:  (1) the movant is likely to prevail at trial; (2) the movant is suffering actionable

irreparable harm; (3) balance of the interests of the parties favors the movant; and (4) public

policy favors the movant.

For the reasons stated above, the movant, Mr. Rolland, is not likely to prevail at trial and

has not and is not sustaining any actionable irreparable harm because he does not own the

trademarks, never had a right to control quality or, if he did, he forfeited the right by failure to

exercise it, he consented to (licensed) all IP uses exercised by SFAB, which is immunity from

13

infringement, the quality of the SFAB synthetic bows is exceptional and better than the quality in France which is the bench mark, and Mr. Rolland admits, in his self-serving Declaration. that his reputation is excellent.

In balancing the interest of the parties, the scale weighs heavily in favor of the Defendants. SFAB has in good faith been funded in excess of one-half million dollars and has operated for about six and one-half years, has a growing business expected to be profitable in the near term and has been and is being victimized by Mr. Rolland's lies and manipulations.

Public policy can not be said to ever endorse or favor the destruction of a company (SFAB) existing for six and one-half years using technology and IP purchased from SBR and licensed from Mr. Rolland which he claims to own, where Mr. Rolland now attempts in bad faith to repudiate his earlier approval of SFAB's multi-cavity technology, which Mr. Rolland co-designed, falsely misrepresenting to the Court that he only recently learned of the multi-cavity technology.

### IV. BOND

If any form of preliminary relief sought by Mr. Rolland in his proposed order is granted by the Court, it should be accompanied by a $2 million bond from Mr. Rolland to later make SFAB whole.

## V. CONCLUSION

For the reasons presented above, no preliminary relief in favor of Mr. Rolland and against Peter or PPS should be granted.

DATED this 17th day of September, 2004.

> Respectfully Submitted,
> PETER PRIER & SONS VIOLINS,
> INC., et al.
> By their attorneys,
>
> \_\_/s/ John L. Dupré_____
> John L. DuPré (BBO #549659)
> Mary K. Murray (BBO #654194)
> Hamilton, Brook, Smith & Reynolds, P.C.
> 530 Virginia Road
> P.O. Box 9133
> Concord, MA 01742-9133
> Telephone: (978) 341-0036
> Attorneys for Defendants

Of Counsel:

Lynn G. Foster
Law Offices of Lynn G. Foster, L.C.
602 East 300 South
Salt Lake City, Utah 84102
Tel. (801) 364-5633
Fax (801) 355-8938

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail on September 17, 2004.


_____/s/ Mary K. Murray_____
Mary K. Murray



@PFDesktop\::ODMA/MHODMA/HBSR05;iManage;499965;1